One of my colleagues wants to let the crowd depart. I think I'm missing out on a good argument, but we'll let them depart. It's like in baseball when you've got a white fence in center field. I can't break up the focus here. You can start now. Good morning, Your Honor. This is Tianyi Zhu appearing on behalf of defendants appellants in this appeal. This case raises crucial practical questions, including must the named defendants be officially summoned to court before the court issues a preliminary injunction against these defendants? How strictly the court should follow the requirement of Rule 65d when issuing a preliminary injunction order? And how high will the court raise the trademark barrier to competition? Plaintiffs invented a stand mixer, patented the invention, and described the product as patented in its trade literature. But then the patent expired, and as under the Constitution, all patents eventually must. No longer armed with the patent, plaintiffs tried a new tack to exclude competition. Plaintiffs registered the appearance of its product as trademark, and now claim that plaintiff's stand mixer is protected under the trademark law. This being said, plaintiffs filed lawsuits against defendants in this case for trademark infringement, trade dress infringement, unfair competition, and other state law claims back in January 2022. The same day, plaintiffs filed a motion for a preliminary injunction. Despite the district court lack of personal jurisdiction over those defendants, since the service of process had not been effectuated, the district court nonetheless entered a preliminary injunction order on June 14, 2022, which contradicts to the Supreme Court precedent that in the absence of service of process, a court may not exercise power over a defendant. In order for the district court's preliminary injunction to be valid, the court had to have personal jurisdiction over the defendant. A preliminary injunction like this entails that a plaintiff can decide who to choose around the world to bring into the forum and ask the court to issue an injunction against the party without effectuating service of process. The district court's freely handing out preliminary injunction orders against defendants whom it has not acquired jurisdiction is a violation of due process. The language of Rule 65 just says, on notice, and they've relied heavily on a case called Corrigan Dispatch. I didn't see that in your brief you responded to that. Are you familiar with that case? Not really, Your Honor, but I do believe that case was decided prior to the case of BNSF Railway Co. v. Terrell in 2017 by the Supreme Court. In that case, Justice Ginsburg reaffirmed that absent consent, a basis of service of assentments on the defendant is a prerequisite to exercise of a personal jurisdiction. Your contention is that personal service wasn't given to your client using the Hague Convention. Is that correct? Have you denied that were service to have been given to your client, there would ultimately be jurisdiction, personal jurisdiction. Did you make that argument to the district court when you appeared? Or was the argument primarily just a failure of service? Your Honor, my argument is that the service of process serving the sentence by an official way in a formal process is a prerequisite to exercise personal jurisdiction. Would you make that claim for a TRO, Temporary Restraining Order?  No, I said would you? You know, if it's a true emergency and you're trying to get emergency relief, to say that you have to serve me with a summons, despite what Rule 65 says about notice, just gives an excuse to the party being hailed into court to just avoid being served with process and the emergency disaster takes place. Your Honor, in this case, there is no such emergency. No, you can't just say it's got to be a certain type of emergency. You either don't have to serve when you seek a TRO or a preliminary injunction. You either just have to give notice or you don't. I believe Rule 65 only requires notice, but combined with the Federal Rule of Civil Procedure, Rule 4, service must first be effectuated and then the next step is whether notice should be given. If it's an emergency TRO scenario, that's why a lot of plaintiffs in other district courts, they applied for an ex parte TRO and along with that, they applied for a motion for alternative service. May I proceed, Your Honor? Surely. The district court's evaluation of due process did not stop here. The district court issued a preliminary injunction, which is in a violation of Rule 65D, since it lacks specificity, merely referred to the analysis, which should be conducted by the court, but merely referred to whatever the plaintiff's motion for a preliminary injunction, especially in terms of analyzing the DGS test required to prove likelihood of confusion. This is evident in the Record on Appeal, Document No. 843. The preliminary injunction's failure to comply with Rule 64D is further compounded by the fact that it fails to provide specific guidance on prohibited behavior. For example, in the 1A of the preliminary injunction order, it includes a portion saying, quote, any mixer that is similar to the infringing mixers, close quote. In a recent case decided by the Federal Circuit, it held this injunction that by their terms apply to, quote, any device, close quote, within the scope of the patent claims, do not meet the specificity requirement of Rule 65D. The district court's injunction not only carries procedure defects, including ruling requesting destroy and recall, but also fails to establish the standard necessary to justify a preliminary injunction. Plaintiff's alleged trademark protection contradicts with the functionality doctrine, which prevents a producer from using trademark law to inhibit legitimate competition by controlling a useful product feature. If a product's functional features could be used as trademarks, a monopoly over such features could be obtained. Here, the affluent consumer, the middle class consumer, and the low income consumer, they may all want to have a stand mixer that is affordable and can work properly. But Whirlpool was very careful to say it's not trying to say their mark that's protectable is the mixer itself and its functionality. They were saying it's the rounded head, the rounded edges, the sloped neck, the rounded base, the ornamental features, the design features, not the functional workings. But that's contrary to what the plaintiffs described in their treat literature. As shown in the record on appeal, document number 607, it's clear to state, quote, And in the same advertisement, it states this particular product feature reduces the price to a much more affordable price to consumers. And as stated by the Justice Kennedy, in traffics, a feature is also functional when it is essential to the use or purpose of the device or when it affects the cost or quality of the device. So that's defendant's position that the Whirlpool's trademark is functional. And in addition, in the district court, defendants introduced the utility patents owned by the plaintiffs. Once the utility patents were provided, the burden of proof should be shifted to plaintiff to prove the non-functionality of its trademark. Yet plaintiff failed to carry its burden because what the plaintiff's statement are nothing more than conclusory. Plaintiff's argument about commercially available alternative designs of a static mixer is meritless and irrelevant in that this argument directly contradicts with the ruling in traffics. As Justice Kennedy stated in traffics, and I quote, And the fact that a dual-spring design is functional means there is no need to engage in speculation about other design possibilities such as the use of three or four springs or hiding springs. Close quote. It's also worth noting, even if plaintiff's trademark passed the functionality test, plaintiff still fails to prove likelihood of confusion. The legislative intent of the LNMAC, specifically with regard to trademark infringement, is to protect consumers from confusion in the marketplace. The core issue in trademark infringement cases is whether use of a particular trademark is likely to cause confusion among consumers as to the source or origin of the goods or services associated with that mark. As this court wrote in Extremely Luscious LLC, a failure to show actual confusion raises a presumption against likelihood of confusion. Till today, plaintiff failed to provide a single incident of actual confusion. No Amazon seller brought a defendant's mixer and then left an Amazon review. Gee, I thought I was buying from KitchenAid. Rather, as shown in the exhibits provided by plaintiff to support its motion for preliminary injunction, Amazon customers who left reviews on defendant's product page mentioning plaintiff's products, none of these customers confused the two. This is evident in the Record on Appeal document number 495, 497, 498, 513, and 514. You flew in and attended the PI hearing. Yes. Is your argument that the magistrate and the district court, they improperly balanced the digits of confusion or that they failed to do the analysis at all? The district court, in the PI order, they failed to do the analysis at all. They simply referred to the analysis conducted by plaintiff in plaintiff's motion for a preliminary injunction. That's a violation of the Rule 65D. The lack of actual confusion for nearly two years weighs heavily in favor of defendants in this case, since plaintiff failed to identify any source of confusion or provided any evidence of actual confusion. Besides, plaintiff's product had been available on Amazon since September 2020. This is evident in the Record on Appeal document number 512. Plaintiff's delay in filing this lawsuit 18 months later proves the lack of irreparable harm. Additionally, public interest favors a reverse of the district court's ruling, as Justice Scalia stated in Walmart. I quote, Close quote. In this case, plaintiff's attempt to use trademark law to prevent legitimate competition is a clear example of such tactics. The district court's violation of due process in issuing the preliminary injunction order only serves to compound this injustice. It's our sincere hope that this court will uphold the principles of fairness and justice in this ruling and prevent such abuses of the legal system in the future. I will reserve the rest of my time for rebuttal. All right, Counsel. Thank you. Thank you, Your Honor. Good morning. May it please the Court. Mark Larelli on behalf of the Whirlpool Parties. This case isn't about preventing competition of all stand mixers. There are plenty of stand mixers in the marketplace. In fact, the defendants have many stand mixers in the marketplace. This is about one model that was designed expressly after the iconic KitchenAid stand mixer that's been around for 80 years. The KitchenAid stand mixer, as the papers show, is well-known. There are surveys. There's all kinds of recognition in the marketplace because when people see the design, see the look of that, they know that it comes from a particular source. And the district court noted that this particular model from the defendants includes very similar curves and geometries to those curves and geometries that are embodied in the asserted marks. Those asserted marks cover the KitchenAid stand mixer. Those stand mixers, over the course of the last 80-plus years, have generated billions in revenue. It's subject of millions of dollars of advertisements, are part of celebrity chefs and famous cooking shows. It is our reputation. It is extremely important to us. In fact, we have a survey that shows that the customer recognition of just the design, not the name, just the design, just those curves and geometries, is off the charts. And we got a protection from the federal government through an incontestable trademark registration, and that was quite some time ago as well. Now what happened in this case is the defendants copied that design. There's only one reason for it. They can make other stand mixers. They do make other stand mixers. The only reason for this copying is to benefit from the goodwill and reputation that KitchenAid and Whirlpool have generated over the last 80 years. It is taking our reputation away from us, and it is harming us irreparably. That's why we filed suit. That's why we moved for a preliminary injunction. That's why we took every effort to put them on notice from day one. If you've seen the papers, they don't dispute notice because notice was provided via mail, was provided via hand delivery in China, was provided via text message to their authorized legal representatives in China. They had notice, and counsel showed up at the preliminary injunction hearing four months after we filed the suit. Counsel showed up. She'd been hired the night before. She traveled the night before, I believe is what the record says. She'd been hired the night before. She traveled that night. She said, can I brief this? Didn't the magistrate issue the district court the same day as the hearing issued the PR? I believe what he asked was, why didn't your client do something in the last two and a half months asking for briefing? And there was no response to that. There was no opportunity to brief. They show up, and they say, can I brief this? My concern, and put aside jurisdiction for a minute, is unless I'm mistaken, the only analysis of all the digits of confusion is one sentence on page three of the magistrate's rule of court recommendation. I think that if I can address that question first, that's the sentence that you're referring to is what counsel indicated. That's one. There's another sentence in that order that says the defendants did not dispute any of the facts that are presented by rule of court. And this court holds that when facts are not disputed, that it does not need to go through a detailed analysis of findings of fact. But there is another portion that I'll point your honor to. Well, they objected to the report and recommendation saying there's no likelihood of confusion. They did. My problem is where has any court ever actually assessed likelihood of confusion? In other words, this isn't an exact identical thing. There's the brand on it. There's no dial versus the switch. The slope's a little different. There are a lot of things to argue about, especially with no evidence of actual confusion. I can't think and I couldn't find a circuit court opinion affirming where no court below applies the digits of confusion. Your honor, if you go to the record on appeal and specifically go to page 1104, it was in a supplemental report and recommendation on motion to stay. But there is further analysis of the digits of confusion, which basically said, look, there's four key digits of confusion. The type of trademark, and that goes to, is it a strong trademark? And there's no dispute here. Can't be any dispute that this is one of the strongest trademarks that exists. The similarity of the marks, and this is where the judge went through and said that curves and geometries are nearly identical. And that's what's protected in the mark. The other thing was the products. This is an important point, your honor. They're the same products. This isn't talking about, you know, they cite the Domino's sugar versus Domino's pizza. This isn't that type of confusion case. This is the same products. And the last one was the retail outlets and the purchasers, which the court found was identically the same. Those are four critical, many courts say the most critical factors. And that's where the district court said all of those find for likelihood of confusion. So even if you throw out the other factors, the record here is very, very strong. And the other factors support us as well. I started off about talking, why do they need to make a stand mixer with the same curves and geometries? This court has found that that type of conduct is enough for an inference of confusion. Where you know that they haven't come forth with evidence and said, oh, we didn't know about KitchenAid. We didn't know about this stand mixer that's been in the marketplace for 80 years, that's a market leader. They never presented evidence of that. No, because they know of it, they came up with the curves and geometries in order to ride off of our coattails. And this court in Chevron, in huge price differential. And do you all sell off the internet or not? We do, we sell at the exact same channels. So the theory here is that it was enough similar that someone will jump to their website. And then the law doesn't require that then they still know this isn't a whirlpool? Because the, is that correct? So yes, Your Honor, confusion, we use the word confusion, trademark lawyers, in a very shorthand way. I heard today it was confusion as to source or affiliation. Well, it's actually broader than that. It's source, affiliation, sponsorship, license, approval, right? It's confusion as to a lot of things. And this court many times has approved what's called initial confusion. You see it, oh, well that reminds me of KitchenAid. I'm going to look at that a little bit more. That's enough. That is the Elvis Presley case is one example of that. Sort of bait and switch, even if then the price makes it very obvious this isn't a KitchenAid item. Well, let's go to the price argument for a second. This court has said in extreme lashes price difference, or price doesn't matter. And it doesn't matter when you have those other things. But let's look at what's happening in this case. It's not that they advertise their product for, as they say, 47% below our price. They advertise their product at our price and show a discount or a bargain for 47% below. Very different when you look at what was there. And those were numbers that came from our, I believe it was our motion in opposition to their motion to stay, the preliminary injunction, because it looks like they're trying to sell off their inventory before the injunction gets applied. So just to be clear back, I mean it's helpful. When you say look at 1104, that's a supplemental analysis that was done. Yes. And as this court is well aware, the analysis doesn't need to be done when the injunction is entered so long as there's something to look at. There's plenty to look at with the original injunction because the facts aren't disputed. And I can give you citations to the cases from the Fifth Circuit that provide that that is enough. But we have more to go on. And that more is 1174 with regards to the likelihood of confusion. Does their product have their brand visible and prominent on it? It's on one view you can see it. Is that, how do you, that's not? It's not, it depends on which view you see. But when they advertise on the Internet, do you see their brand prominent? Sometimes, sometimes. And then they don't have a dial. I mean these are little points of difference that are pretty significant though. Well, I'd like to direct your attention to the Chevron case. And they made similar arguments there because the brand name was, it was Ortho was one. It was High Yield was the other one. And they made the, the argument was made there that, look, the brand names are different. And that was a trade dress case. It was about coloring on labels for these types of home and garden products. And they said, well look, people are going to buy chemicals, they're going to look at the label. They're going to see High Yield and Ortho. And this court said, even if close examination would differentiate the products, that is not sufficient to dispel the initial confusing similarity. And in that case, which granted a preliminary injunction, they were very clear. It's not error to determine similarity on the basis, I'm sorry, it was error. Because, I'm sorry, that was not a preliminary, my apologies. But it was reversed. It was error to determine dissimilarity based on close examination and comparison in the face of close overall similarity. So you've seen the pictures in the briefing. I don't think anybody can deny that their product was designed to look enough like ours to ride off of our coattails. Well, you work in this area. I guess when I look at it, some of it does seem functional. You're going to have to have a stand. And so a lot of the similarity could be said to be functional. But I'm mixing and matching, right? That goes to whether you had a protectable mark at the outset? It goes to the protectable mark, correct. And Judge Payne addressed that as well. He talked about, and I can, that is actually on 11.02 and 11.03 in more detail. But we are not trying to stop them from selling their other stand mixers. In fact, the pictures are in the briefing of their own stand mixers. Provide the same thing, provide the same mixing, provide the same everything else. But they didn't copy the look and the appearance. And it's that look and the appearance that we not only have an incontestable trademark registration for, but we also supplied survey evidence that said when people see that, without the name KitchenAid, without any names on the product, consumers, now I don't know whether you're the appropriate consumer or not for this particular product, but consumers think it's a KitchenAid. They think it's one brand and the numbers are overwhelming that it's KitchenAid. That is a remarkable asset to have in the marketplace. But it's an asset that took 80 years to build. I mean, 1937 to today. You can't name too many products that you could see one from 1937 and see one from 2023. It's the same. Let me just test you a teeny bit on that. It's got quirky aspects to this case. The English or Wales decision that was offered. Close to 50 pages, a fair bit of consumer statements that they know what KitchenAid is. They don't ever get confused. Everyone knows how good KitchenAid is. But that's the same product? Well, there's two main, well, three main aspects. One is it's not our law. Second is KitchenAid is a uniquely American company and brand. It does not have the same history in the U.K. as it might have in the United States. It has a history, and they talk about that history in that case, but it's not 80-plus years. But the third thing is it's a different product. And if you look at the product, it doesn't have the curves and geometries that this product has, that Judge Payne found objectionable. So when we think about the importance to us and think about the reputation of ours this product is taking, we go to court and we ask for a preliminary injunction. We provide the notice in all those ways that we've said, and we ask Judge Payne for a hearing. And he says, well, you can have a hearing, but you've got to now tell the defendants in the exact same ways that you told them before, email, mail, hand delivery, text to their legal representatives, that we're going to have a hearing, you know, several weeks out. We do that. We have the hearing, and we hear three arguments. The first one is that process of service, right? They knew about the hearing. They knew about the complaint. They had all of this stuff for months. They say you have to be served with process before a preliminary injunction can be entered, and I think that's a misunderstanding of concepts of preliminary relief versus final relief or final judgment. Since you know this area of law well, what about our enterprise decision that seems to be a little bit in tension with Corrigan Dispatch, correct? Not when you read the case and the facts. So Corrigan Dispatch is very clear, and it was, of course, the first of the panel decisions, so it controls. But that's very clear that service of process isn't required for a preliminary injunction. And in that case, the service of process came after the injunction, and it's not a problem. Enterprise was a little bit different in that there's two defendants. One defendant didn't dispute personal jurisdiction. The other defendant said, you're never going to have personal jurisdiction over me because I'm an Ecuadorian oil company. You're never going to have personal jurisdiction over me, so I object to any proceedings. The court said, I don't need to decide that now, and moved on. Can't do that. You've got to decide, as the court in Enterprise said, whether there's a reasonable probability that there will be personal jurisdiction at the time of the trial on the merits. Here, there's really no dispute that service of process will occur at the time of the trial on the merits. This wasn't a challenge that, look, hey, we're a foreign company. You're never going to have jurisdiction over us. This was not that type of challenge. So I think they're both reconcilable fairly easily. To confusion, or I'm sorry, to functionality that you're on a raise. It's not the first time that this court has looked at functionality for a stand mixer. There's a Sunbeam case from 20-some years ago for a stand mixer that was nowhere near as iconic and as longstanding as the KitchenAid stand mixer. It addressed functionality in kind of a similar way. No one's trying to stop stand mixers. It's the design. And when you cite cases like Trafix and that things are in patents, well, Trafix was about, and we all see them on the side of the road. They're road signs that have springs that allow the road sign to sway back and forth when the wind comes. And what they were pointing to as the trade dress was the spring. It was the thing that made it work. It wasn't the shape of a spring. It wasn't, the court was very clear in Trafix that, look, we're talking about a functional spring. We're not talking about, I think their language was curves on the legs of something, right? Ornamentation, flourishment, that's what this case is about. Totally different from Trafix. The other case that they cite, the Eppendorf case, was a pipette for taking liquid in a lab setting and moving liquids between vials. And that was about fins on a pipette that were needed to make it strong. It wasn't about what it looked like. This was in a lab environment. Nobody really cared too much, right? It's not the perception, the reputation of your company that's put out there every day in your advertisements, in your sales, in your marketing. So I think functionality is a red herring. We have a registered trademark, which means we get a presumption or a prima facie case of non-functionality. The patents that they reference have nothing to do with design or appearance that we're asserting in this case. And I think that that comes fairly clear. On the likelihood of confusion, I think that, again, I do think it's very clear. I did want to address one issue that wasn't raised because I think it kind of brings us all together. They make the argument that some of the factors talk about retail channels, advertising types, and things along those lines. And they say, well, Whirlpool, they advertise on cooking shows. They sell in brick-and-mortar stores all over the country. They spend all of this money in advertisements. They sell online and Amazon and Wayfair and everywhere else. But there's not complete overlap because defendants, we only sell on Amazon. And they say that that somehow favors them. I don't know how that could be. What we're looking for is factors about confusion and what they do exactly overlaps with where we are. It doesn't need to be complete overlap, but there's a reason why it's not complete overlap is because of their intent. They want to ride off of the coattails of Whirlpool, bait and switch, make money on the most profitable channel in the United States without advertising, without spending money, without getting your product known out there through brick-and-mortar retailers and all of those things. I think that that argument really kind of encapsulates where they are in this case. They want to hide behind the hate convention. They want to say that, oh, we're different from Whirlpool because we only sell into one channel. And this court in that Chevron case talked about that a little bit because in there, the defendant, that high yield, they only advertise at the point of sale, whereas Ortho advertised everywhere. And they still found that that factor, of course, favors a likelihood of confusion. My time is up, so if there's no other questions, I will sit down. Thank you, counsel. Thank you. Your Honor, in terms of plaintiff's argument, actually there are similar products on Amazon Marketplace rather than the exhibits provided by plaintiff. There is an identical item there, but plaintiff did not bring a lawsuit against that seller. Plaintiff's arguments on the merit merely based on the presumption that their trademark is valid. However, the validity of their trademark is challenged here by defendants. Defendants provided the utility patent to show the functionality of plaintiff's trademark. There may be other limitations on plaintiff's claim going to competitive need of available alternatives, any of the various multi-factor tests. But if functionality is going to serve the purpose of demarking the regime of trademark and trade dress and patent law, it must be satisfied by showing that it is a useful product feature, and in our case, that's significant. Because you cannot get a utility patent, as plaintiff's had, without showing it's a useful product feature. So the fact they had a utility patent, and it is covered, the stand mixer should be enough to establish functionality, and therefore should be enough to reject their claim. In terms of the service, plaintiff knew that they need to serve the defendants, but recklessly ignored the requirement and only tried to serve defendants eight months after the initiation of the lawsuit, one month after the magistrate judge issued an order requesting proof of service of process. The defendant hadn't got to the stage to challenge personal jurisdiction since the prerequisite to exercise personal jurisdiction hadn't met. If defendants were served with the process, it's uncertain whether personal jurisdiction will be proper, and that's the time when defendants may challenge whether exercising a personal jurisdiction over defendant will be proper. And the only argument plaintiffs argued on this issue is defendant offered to sell or sold alleged infringing products to Texas. However, at this court last year in Gagic, LLC, the court held in order to demonstrate that a trademark infringement and unfair competition claims arose out of sale directed to Texas, plaintiff was required to show that those sales were to customers who could have been potentially deceived by the alleged infringement, and the sales to plaintiff's attorneys or other agents were improper attempts to manufacture contacts with the state. Furthermore, I think in terms of justice, the preliminary injunction order must be reversed, because if the plaintiff is allowed to drag any defendant worldwide to a forum and get a preliminary injunction, destroying their assets is a violation of the due process. That concludes my argument, Your Honor. Is there any questions? Thank you very much. Thank you, both of you, for helping us understand this case a little better. We will take a short recess before taking the last case.